Filed 4/30/14  P. v. Davis CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DERRELL RONALD DAVIS,<br><br>     Defendant and Appellant. | A134279<br><br>(Alameda County<br>Super. Ct. No. 162119A) |

A jury convicted defendant Derrell Ronald Davis of the first degree murder of Ronnie Grier, as well as illegal possession of a firearm by a felon, and enhancements for using a firearm and causing great bodily injury or death.  The trial court found prior conviction allegations true, and sentenced Davis to 80 years to life in prison.

On appeal, Davis contends (1) the trial court erred by not instructing the jury to determine whether a witness was an accomplice whose testimony required corroboration, (2) the court erred by admitting opinion testimony by an investigating officer, (3) the prosecutor committed misconduct by urging the jury to consider testimony by the officer for its truth rather than for the limited purpose for which it was admitted, and (4) his trial counsel was prejudicially ineffective for failing to introduce the videotape of a police interview of a witness.  We affirm.

1

# I. BACKGROUND[1]

Two drivers discovered Grier's body on a street in the early morning hours of November 14, 2008. Grier suffered three gunshot wounds to his head.

Terrell Fisher, who is Davis's half brother, testified Davis shot and killed Grier. Fisher met Grier in 2008 through Fisher's and Davis's cousin Jamerl Taylor (who later pled guilty to voluntary manslaughter for his role in the killing, and testified for the prosecution). Fisher moved in with Grier at the home of Grier's girlfriend Trina.

A few days before Grier was killed, Fisher heard Davis and Grier arguing at Trina's house. He heard them yelling and cursing, but did not know what the argument was about. Davis was doing all the arguing. Grier seemed like he did not have a problem and left.

Also a few days before Grier was killed, Taylor told Fisher to watch out for Grier, and said Grier might be trying to set Fisher up. Fisher did not know what Taylor was talking about. On the day before Grier was killed, Taylor again pulled Fisher aside and told him to watch out for Grier.

Taylor testified Davis was not as close to Grier as others in their circle were. Taylor was aware Grier and Davis had a physical altercation a few days before Grier was killed. The day before Grier was killed, Davis said: "I'm going to kill this nigga," and "Fuck this bitch ass nigga." Taylor did not know whom Davis was referring to, and when Taylor asked, Davis did not give a name. Davis said, "Somebody within our circle," which made Taylor think Davis was talking about Grier. Davis also referred to "that bitch ass N word, Rell." Davis and Grier were the only two people with the nickname "Rell" in their circle of friends.

The evening before Grier was killed, Fisher, Davis, Taylor, and Taylor's brother Jamar drove from Trina's house in Taylor's car to Jamar's house, where they dropped Jamar off. They then drove to Davis's house. Davis said he had to run inside to get

---

[1] We provide additional background facts in the sections of this opinion addressing Davis's arguments on appeal.

2

something and went into his house alone for a few minutes. Fisher did not see Davis with a gun before this stop.

Later that night, Fisher went to the bus stop because he wanted to go buy alcohol. He saw Taylor pull up to a nearby gas station, so he called Taylor, who picked him up. Taylor was driving; Grier was in the front passenger seat; Davis was sitting in the back behind Grier; and Fisher got in the back behind Taylor. Taylor drove them to a convenience store, where only Fisher got out and bought alcohol.

When Fisher got back in the car, it appeared Taylor did not want him in the car; Taylor suggested taking Fisher back to Trina's house. Davis said he, Grier, and Taylor were going to pick up some girls. Fisher wanted to stay and asked what they were going to do. Davis said Fisher could come with them. Rap music was playing loudly on a boom box in the front of the car. Davis and Grier were dancing to the beat of the music.

Fisher was looking out the window. Davis tapped his shoulder and showed Fisher he was holding a gun. Davis said, "It's loaded too." Fisher returned to looking out the window. Fisher and Taylor heard a shot, and Fisher saw a flash. Fisher and Taylor both looked and saw Davis had the gun to Grier's head. Davis then fired a second shot. Fisher testified that, after the second shot, the gun appeared to jam. Davis moved his hand back and forth on the gun to fix the slide, and then shot a third time. Grier's head slumped forward.

Fisher and Taylor testified the gun Davis used appeared to be a .22 caliber semiautomatic. Both Fisher and Taylor had seen Davis with the gun before and had noticed that it jammed.

Taylor stopped the car on a dead-end street, kept his foot on the brake, lifted the center console, reached over Grier, and opened the passenger door. Taylor tried to push Grier's body out of the car. Taylor asked Davis for help, and Davis reached from the back seat to help push Grier's body out. Fisher also testified Taylor used a foot to push Grier out of the car. Fisher did not touch Grier. The top part of Grier's body was out of the car, and his feet were still inside. Taylor began to drive, and Grier's feet fell out, so

3

that his body was entirely in the street. Taylor testified that, as he made a turn, the passenger door closed on its own.

Fisher testified that Taylor said to Davis, "Good shit." Davis and Taylor clasped hands and "gave each other some skin." Davis told Fisher, "I know that was your friend, but he had to go." Taylor looked at Fisher in the rear view mirror and told Fisher, "[Y]ou better not say shit." Taylor testified he told Fisher not to say anything because he was afraid Davis would do something to Fisher too. Taylor thought Fisher looked shaken and afraid. Davis said, "He ain't going to say nothing."

Taylor drove back to Trina's house and dropped off Fisher.

Taylor later used bleach and other products to attempt to clean blood out of the car. Neither Fisher nor Davis helped clean the car.

When police later searched the car, they found blood in various locations in the front and back right side of the car. An area of discoloration on the right rear floorboard was consistent with a bleaching reaction. The blood in the car indicated someone suffered a significant wound in the car, and a gunshot wound would be a reasonable explanation for the evidence. Based on DNA testing, Grier could not be eliminated as the donor of the blood found in Taylor's car. The medical examiner, an expert in forensic pathology, testified Grier could have been shot from behind.

An expert in tool markings and firearm identification testified she was able to determine two of the bullets removed from Grier's head were .22 caliber; as to the third bullet, the expert could not determine the caliber, but it was similar in weight and shape to the others.

## II. DISCUSSION

### A. Jury Instructions as to Accomplice Testimony

#### 1. Background

During closing argument, defense counsel stated: "But when you break it down, it is as reasonable to assume that Jamerl Taylor and Terrell Fisher were the accomplices to this homicide as it is to say that Derrell Davis is. They both lied and they both lied at the

4

same time and the same way. They admit to consulting with one another in the same way at the same time."

In his rebuttal closing argument, the prosecutor stated: "[Defense counsel] stated that Terrell Fisher was an accomplice. Wrong. You will receive instructions on accomplice testimony. The accomplice instruction only applies to Jamerl Taylor. Before relying on anything Jamerl Taylor says, you must find slight corroborating evidence. [¶] If the [c]ourt . . . believed Terrell Fisher was an accomplice, you would have received an instruction saying that Terrell Fisher is an accomplice." Defense counsel objected: "Objection. Misstatement of law." The court responded: "What [the prosecutor] is saying is correct." The prosecutor continued: "You will not receive any statements or instructions that Terrell Fisher is an accomplice. Just because [defense counsel] says he's an accomplice does not make it so."

The court instructed the jury that, if anyone committed the murder, then Taylor was an accomplice to that crime, and his testimony required corroboration. (See CALCRIM No. 335.) The court did not give an accomplice instruction as to Fisher.

## 2. The Court Was Not Obligated to Give Accomplice Instructions as to Fisher

Penal Code section 1111 provides a defendant cannot be convicted of a crime on the basis of an accomplice's testimony unless that testimony is corroborated by other evidence connecting the defendant with the commission of the charged offense. An accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." (Pen. Code, § 1111.) This definition encompasses all persons who are "principals" to the charged crime, including perpetrators and aiders and abettors, but does not include persons who are merely accessories. (*People v. Fauber* (1992) 2 Cal.4th 792, 833–834.) The defendant has the burden to prove by a preponderance of the evidence that a witness is an accomplice. (*Id.* at p. 834.) "If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request." (*People v. Brown* (2003) 31 Cal.4th 518, 555.)

5

Davis contends the court should have instructed the jury to determine whether Fisher was an accomplice whose testimony required corroboration. (See CALCRIM No. 334.) We disagree. There was not sufficient evidence to permit the jury to conclude by a preponderance of the evidence that Fisher was an accomplice to the murder. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 302.)

As the parties note, Fisher's presence at the scene of the shooting is not sufficient to establish his status as an accomplice on an aiding and abetting theory. (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1161.) A person's presence at the scene of the crime and his "intimate knowledge" of the crime, without more, only establish he was an eyewitness and not necessarily an accomplice. (*People v. Lewis* (2001) 26 Cal.4th 334, 369.) Davis points to no testimony or physical evidence showing that Fisher committed the shooting, or that he intended to and did assist in the crime with knowledge of the perpetrator's criminal intent. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 259 [elements of aiding and abetting liability]; CALCRIM No. 334.)

Davis argues that Fisher's inconsistent pretrial statements, and inconsistencies between his testimony and Taylor's testimony, undercut his credibility. Davis notes that, when police initially interviewed Fisher in November 2008, he said he did not know what happened to Grier; at trial, Fisher testified he lied in this interview to protect Davis, and because he was worried about going to jail. During a second interview in December 2008, Fisher told police Davis had shot Grier, but Fisher's statements in the second interview differed in some respects from his trial testimony. In the December 2008 interview, Fisher stated he had never seen Davis with a gun before the day of the shooting. At trial, Fisher testified he had seen Davis with the same gun a few times before the shooting. During the December 2008 interview, Fisher said that, when Taylor called Fisher after the police impounded Taylor's car, Taylor told Fisher, "Don't say shit." At trial, Fisher stated he did not recall what Taylor said when he called Fisher after his car was impounded. Finally, Davis notes Taylor and Fisher testified differently as to certain aspects of the shooting, such as whether there was a pause after the first or second

6

of the three shots, whether Grier wore a hat, and whether Taylor used his feet to try to push Grier's body out of the car.

Davis argues that, based on the above inconsistencies, the jury could infer Fisher was fabricating his account of the incident and, therefore, might be covering up his own involvement in the shooting. But the inconsistencies between Fisher's pretrial statements and his trial testimony, and between Fisher's and Taylor's testimony, while relevant to the jury's assessment of Fisher's credibility, do not mean Fisher was an accomplice. Any witness who was present at the scene of a crime may be subject to impeachment based on having incomplete or inconsistent recollections of the event, or having made inconsistent statements about it. Davis cites no authority establishing this is sufficient to require the giving of accomplice instructions for such an eyewitness.

Davis also points to the testimony of the defense expert on blood spatter analysis and crime scene investigation, who opined the blood spatter in Taylor's car was not consistent with Grier being shot in the front seat. Again, although the jury could consider this testimony in assessing Fisher's credibility, it does not show Fisher was an accomplice, and it did not require the court to give accomplice instructions as to Fisher.

Davis also argues there was "strong evidence" Fisher had a motive to kill Grier, and Taylor implicated Fisher in the killing. But Davis overstates the evidence on these points. As to Fisher's alleged motive, Davis cites Fisher's testimony that Taylor told Fisher a few nights before the shooting to watch out for Grier, because Grier might be trying to set up Fisher. Fisher testified he had no idea what Taylor was talking about, and he told Taylor he had no problem with Grier. As to Taylor's alleged implication of Fisher, Taylor wrote a note to his police interviewers saying: "Terrell Fisher knows everything. More than me. I really don't know much. I'm serious." Taylor brought up Fisher's name as someone the police should interview. Davis cites no evidence that Taylor accused Fisher of committing, or aiding and abetting, the shooting. The cited evidence is not sufficient to support a conclusion Fisher was an accomplice, i.e., that he could have been charged as a principal in the shooting of Grier. (See Pen. Code, § 1111.)

7

In *People v. Lewis,* which the parties discuss, the Supreme Court rejected the defendant's argument that the trial court should have given accomplice instructions as to an eyewitness to the crime. (*People v. Lewis, supra,* 26 Cal.4th at pp. 369–370.) There was evidence the alleged accomplice was at the crime scene, "had intimate knowledge of the crimes beyond that of a mere bystander," had a habit of carrying sticks or boards (similar to the murder weapon), and had a reputation for dishonesty. (*Id.* at p. 369.) The alleged accomplice offered inconsistent testimony. (*Ibid.*) There was testimony that bloody shoes found at the scene fit the alleged accomplice better than the defendant. (*Ibid.*) The defendant theorized the victim was attacked by a left-handed person, and the alleged accomplice was left-handed while the defendant was right-handed. (*Ibid.*) The Supreme Court found no error, characterizing the defendant's evidence as "not substantial but speculative." (*Ibid.*) Although Davis seeks to distinguish *People v. Lewis* and argues there was strong evidence here of Fisher's accomplice status, we reject that argument for the reasons discussed above. We conclude there was "no evidence other than speculation that [Fisher] planned, encouraged or instigated [the murder of Grier] to give rise to accomplice liability." (See *id.* at p. 370.) Accordingly, the court was not obligated to give accomplice instructions in connection with Fisher's testimony.

### 3. The Prosecutor's Argument

Davis contends the trial court erred in its response to the prosecutor's statements during closing argument about Fisher's accomplice status. We disagree.

As noted, when there is sufficient evidence to support a finding a witness is an accomplice, the court must, sua sponte, instruct jurors to determine whether the witness is an accomplice. (See *People v. Brown, supra,* 31 Cal.4th at p. 555; CALCRIM No. 334.) Accordingly, the absence of any accomplice instruction as to a witness reflects the court has not determined there is sufficient evidence to support such an instruction (a point Davis appears to concede in his reply brief). The prosecutor thus was correct in stating during closing argument that, if the court *had* determined there was sufficient evidence Fisher was an accomplice, it would have so instructed the jury. When defense counsel

8

objected that the prosecutor had misstated the law, the court did not err by stating the prosecutor's statement was correct.

Davis appears to suggest that, whether or not the trial court concluded there was sufficient evidence to support an accomplice instruction, he was entitled to seek a jury finding that Fisher *was* an accomplice. Not so. When the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the court need not submit that issue to the jury. (See *People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 302.)

## B. Sergeant Basa's Testimony

### 1. Background

The prosecutor asked investigating Sergeant Caesar Basa if, during his investigation, he was "able to exclude Terrell Fisher as the person responsible for killing Ronnie Grier." Defense counsel objected that the question "[c]alls for opinion and conclusion." The court responded: "This is the investigation, so overruled, yes." Basa answered: "Yes, sir."

The prosecutor asked Basa, "Did any human, witness, person, thing in the world [tell you] that Terrell Fisher was the person who shot Ronnie Grier?" Defense counsel objected to the use of the phrase "in the world." The court overruled the objection, stating: "It's a manner of speaking." Basa answered: "No, sir. Not in the world."

The prosecutor elicited from Basa, without objection, that he had not obtained any information in his investigation that led him to believe Taylor shot and killed Grier. The prosecutor followed up by asking whether Basa had obtained any "credible information" implicating Taylor as the shooter. Defense counsel objected to the use of the term "credible," and the court overruled the objection. Basa answered, "No."

The prosecutor asked Basa why he arrested Davis. Defense counsel did not object. Basa answered: "Because the information we received was enough probable cause for us to arrest Mr. Davis." The prosecutor followed up by asking Basa, "[C]ould you just summarize for us?" Basa responded: "Based on the testimony of Mr. Jamerl Taylor and Mr. Terrell Fisher, who is the defendant's brother, we had enough probable

9

cause to make an arrest." Defense counsel objected to the use of the term "testimony." The court and the prosecutor clarified Taylor and Fisher were not under oath when they spoke to the police.

On redirect examination, the prosecutor asked Basa, "As far as Terrell Fisher's demeanor or feelings for Jamerl Taylor, did Terrell Fisher in his second interview seem to be someone who was in cahoots with Jamerl Taylor?" Defense counsel objected to the question as calling for speculation. The court overruled the objection, stating Basa could give his lay opinion based on his interviews of Fisher and Taylor. Basa answered, "No, sir." Basa explained Fisher had stated he believed Taylor was in on the killing.

Referring to the transcript of Basa's December 18, 2008 interview of Taylor, the prosecutor asked Basa whether it refreshed his recollection as to whether he had any information "about any person in the world wanting Ronnie Grier dead." Defense counsel objected to the use of "any person in the world." The court overruled the objection, and Basa answered that the transcript of the interview refreshed his recollection that he had obtained information from Taylor that Davis wanted Grier dead.

In closing argument, the prosecutor, after arguing the physical evidence and testimony of other witnesses corroborated Fisher's and Taylor's accounts of the shooting, stated Basa had conducted a thorough investigation, including interviewing numerous witnesses. The prosecutor argued that Basa had told the jury "that the arrows kept pointing to Derrell Davis, Jamerl Taylor, and Terrell Fisher as being the last persons with Ronnie Grier[.]" Defense counsel objected to the argument as "[m]isconduct," and the court overruled the objection. In his rebuttal closing argument, the prosecutor asked a series of rhetorical questions, including, "Why did you say Ronnie had to go? Why would your cousin say you killed Ronnie? Why was Sergeant Basa able to exclude everyone but you?" Defense counsel objected this was "[i]mproper argument"; the court overruled the objection.

10

## 2. Analysis

Davis argues the trial court prejudicially erred in admitting the above portions of Basa's testimony because it was improper opinion testimony assessing the weight and credibility of the evidence.

### a. Forfeiture

In general, "trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756.) As the Attorney General notes and as Davis concedes, Davis's trial counsel only objected to one of the allegedly improper questions (i.e., the prosecutor's question as to whether Basa was able to exclude Fisher as the person responsible for killing Grier) on the ground it called for improper opinion testimony. Accordingly, Davis has forfeited the argument that any of the other challenged testimony was improper opinion testimony.

We reject Davis's argument that objecting on opinion grounds would have been futile. Davis's trial counsel objected to some of the challenged questions on other grounds, and she could have added the opinion objection if she believed it appropriate. Moreover, the record does not support Davis's suggestion the court would have overruled any objection to Basa's testimony about his investigation. To the contrary, the court sustained a number of defense counsel's objections to questions about the investigation, on such grounds as relevance and that the questions called for speculation. This case thus is not similar to *People v. Hill* (1998) 17 Cal.4th 800, 820–822 (cited by Davis), in which the Supreme Court found it would have been futile for defense counsel to continue objecting to the prosecutor's egregious misconduct because the trial court not only failed to rein in the prosecutor, but repeatedly responded to defense counsel's objections by chastising him for being an obstructionist.

### b. Opinion Testimony

Even if Davis had not forfeited his challenge to most of the above testimony, his argument fails on the merits. "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his

testimony.  (Evid. Code, § 800.)"  (*People v. Farnam* (2002) 28 Cal.4th 107, 153.)  In *People v. Virgil* (2011) 51 Cal.4th 1210, 1253–1254, the Supreme Court held a detective could explain why a murder investigation began to focus on a defendant by testifying that a composite of the suspect viewed by the detective resembled the defendant.  The testimony was based on the detective's perceptions and was helpful for the jury to understand how the detective came to suspect the defendant and how the investigation came to focus on the defendant months after the murder.  (*People v. Virgil, supra,* at p. 1254.)

Similarly, here, to the extent the challenged portions of Basa's testimony included the opinions or conclusions he reached at different stages of his investigation (such as whether he could exclude Fisher as the shooter or whether there was probable cause to arrest Davis), those opinions were based on his perceptions and were helpful for the jury to understand how the investigation came to focus on Davis and resulted in his arrest more than one month after Grier's death.[2]  Grier's body was discovered on November 14, 2008.  After Basa's initial interviews of Taylor on November 19 and Fisher on November 21 (which Basa conducted after receiving information that Taylor and Fisher might have information about Grier's death), Basa was not yet able to exclude Fisher as a person of interest in Grier's death.  Police impounded Taylor's car after a traffic stop on December 10.  When Basa interviewed Taylor again on December 11, Taylor stated Davis killed Grier.  However, without corroboration, Basa believed this statement was not sufficient probable cause to arrest Davis.  When Basa interviewed Fisher again on December 15, Fisher stated Davis shot Grier and Taylor was a willing participant in the crime.  Only then did Basa believe he had probable cause to arrest Davis.  Davis was arrested on December 18.

Davis suggests Basa gave opinions about the state of the evidence at trial (on such questions as whether Fisher or Taylor shot Grier, or whether there was sufficient

---

[2] In his reply brief, Davis argues some of Basa's testimony about the investigation was inadmissible because it was irrelevant.  Davis forfeited this argument by failing to raise it in his opening brief.  (See *People v. Alexander* (2010) 49 Cal.4th 846, 922.)

evidence of Davis's guilt), and thus "improperly intruded on the jury's fact-finding function." We reject this characterization of Basa's testimony. Basa did not opine about the strength of the trial evidence. Instead, he testified about the opinions he held at various points during his investigation based on the information he had obtained.

### c. Harmless Error

Even if Davis had preserved a meritorious objection to the challenged portions of Basa's testimony, any error in admitting the testimony was harmless.

The erroneous admission of evidence generally does not require reversal unless it is " 'reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' " (*People v. Earp* (1999) 20 Cal.4th 826, 878; see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Davis contends this standard is inapplicable here, because the admission of Basa's testimony violated his federal due process rights. Assuming Davis preserved this argument (see *People v. Partida* (2005) 37 Cal.4th 428, 433, 435, 438–439 [state law objections permit defendant to argue admission of evidence had the consequence of violating his due process rights]), we reject it. This is not one of those "rare and unusual" cases where the admission of evidence " 'rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process," ' " thus triggering the standard of review specified in *Chapman v. California* (1967) 386 U.S. 18 for federal constitutional error. (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230, 232.)

In contending admission of Basa's testimony violated due process, Davis suggests Basa, by opining about the strength of the trial evidence and the credibility of witnesses, intruded into the jury's role as the trier of fact. But, as noted above, Basa did not opine about the evidence at trial. He described his investigation, including the opinions and conclusions he formed at different stages. Further, the prosecution's case against Davis was based primarily on evidence other than Basa's limited opinions on these points. The eyewitness testimony of Fisher and Taylor that Davis shot Grier was a much more central part of the People's case than was the challenged testimony by Basa. (See *People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20–21 [where erroneously admitted expert

13

testimony about drug trafficking issues constituted a "significant portion" of prosecution's case, but the case was based "primarily" on other evidence, such as defendant's inconsistent statements during interrogation, admission of agent's testimony did not violate due process].)  Although the prosecutor did refer to Basa's testimony in closing argument, he did so in the context of referring to other evidence (such as physical evidence and testimony of other witnesses) that corroborated Fisher's and Taylor's testimony.

Because the allegedly erroneous admission of Basa's testimony did not violate due process, we apply the *Watson* standard of review.  (See *People v. Covarrubias, supra,* 202 Cal.App.4th at p. 21.)  We conclude it is not reasonably probable a verdict more favorable to Davis would have been reached in the absence of the claimed error.  (See *Watson, supra,* 46 Cal.2d at p. 836.)  For the reasons discussed above, it is unlikely the jury construed Basa's statements as anything more than an account of the opinions he held during the investigation.  In any event, the evidence of Davis's guilt was overwhelming.  (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1295 [erroneous admission of evidence harmless in light of overwhelming evidence of guilt]; *People v. Covarrubias, supra,* 202 Cal.App.4th at pp. 22–23 [even where erroneously admitted expert testimony was relatively lengthy and thus a significant part of the prosecution's case, admission of the evidence was harmless under *Watson* because there was strong evidence against defendant and case was not close].)  Fisher and Taylor both testified they were present when Davis shot Grier.  Physical evidence corroborated their testimony, e.g., their statements that Davis shot Grier three times in the head (information the police had not released to the public when Fisher and Taylor made their statements to Basa), and their testimony Grier was shot with a .22 caliber gun.

### d.  Ineffective Assistance of Counsel

Davis argues that, if his trial counsel forfeited his challenge to Basa's testimony by failing to object on the ground it was improper opinion testimony, then counsel was prejudicially ineffective.  To establish a claim of ineffective assistance of counsel, a defendant must show (1) trial counsel's performance fell below an objective standard of

14

reasonableness under prevailing professional norms, and (2) the defendant suffered prejudice, i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*); *People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* at p. 694; *Carter, supra,* at p. 1211.) Finally, the defendant must show that " 'the [act or] omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make.' [Citation.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 610–611.)

Davis's claim of ineffective assistance fails. He has not shown counsel's performance was deficient. Counsel reasonably could have concluded the challenged testimony about the investigation was not objectionable as improper opinion testimony. (See *People v. Virgil, supra,* 51 Cal.4th at pp. 1253–1254.) Davis also has not shown prejudice. We have concluded above it is not reasonably probable the verdict would have been different if the court had excluded the challenged portions of Basa's testimony.

## C. The Prosecutor's Closing Argument

Davis argues the prosecutor committed misconduct in closing argument by referring to Basa's testimony that, during his investigation, he did not locate any person who said Davis was with him or her when Grier was killed. Davis also contends the testimony was inadmissible hearsay. Davis has not shown prejudicial error.

### 1. Background

At the conclusion of his redirect examination of Basa, the prosecutor reminded Basa that Jamerl Taylor and Jessica Morlan (Taylor's then girlfriend) had initially told Basa they were with Davis when Grier was killed. The prosecutor then asked: "After that was told to you, did any other person in the world tell you that they were with Derrell Davis when Ronnie Grier was killed?" Defense counsel objected to the phrase " '[a]ny other person in the world,' " and objected the question called for speculation. The court overruled the objection, and Basa answered, "No, sir."

15

In closing argument, the prosecutor stated Basa had testified "the arrows kept pointing to Derrell Davis, Jamerl Taylor, and Terrell Fisher as being the last persons with Ronnie Grier[.]" Defense counsel objected to the argument as "[m]isconduct," and the court overruled the objection. The prosecutor then argued (1) Basa had testified he had not found any person who was willing to say Davis was with him or her when Grier was killed, and (2) the defense had not presented any witness who testified Davis was with him or her when Grier was killed.

Defense counsel objected that the prosecutor was improperly shifting the burden of proof to the defense to present evidence. The court overruled the objection, relying on *People v. Morris* (1988) 46 Cal.3d 1, 35–36 (overruled on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, fn. 5), in which the Supreme Court held a prosecutor's remarks about the absence of alibi evidence were proper comments on the state of the evidence.

### 2. Analysis

#### a. Prosecutorial Misconduct

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.] '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) A defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably probable that a result more favorable to the defendant would have been reached if the misconduct had not occurred. (*People v. Crew* (2003) 31 Cal.4th 822, 839.) " '[A] claim of prosecutorial misconduct is

16

not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.]' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

Davis argues the prosecutor committed misconduct by referring to Basa's testimony that, in the course of his investigation, he did not locate anyone who provided an alibi for Davis.[3] Assuming defense counsel's objections preserved this contention for appeal, the prosecutor did not commit misconduct.

As noted, the trial court overruled defense counsel's objections to the underlying testimony and admitted it into evidence. A prosecutor's reference to admitted evidence (even if a defendant argues the evidence should not have been admitted) is not improper. "[B]ecause the trial court admitted the evidence in question, the prosecutor's reliance on it in his closing argument could not have been misconduct." (*People v. Gurule, supra,* 28 Cal.4th at p. 627.)

Davis contends, however, that Basa's testimony on this point was admitted for the limited purpose of explaining the course of his investigation, and the prosecutor committed misconduct by urging jurors to consider the testimony for the truth of that information, rather than for the limited purpose for which it had been admitted. "[U]rging use of evidence for a purpose other than the limited purpose for which it was admitted is improper argument." (*People v. Lang* (1989) 49 Cal.3d 991, 1022.) But the record does not support Davis's assertion that the court admitted the challenged evidence for a limited purpose. The exchange on which Davis focuses (i.e., Basa's testimony that he found no alibi witness) reflects no such ruling by the court.

Davis refers to a few other portions of Basa's testimony, but they do not show the testimony was admitted for a limited purpose. In one exchange, the prosecutor asked Basa: "Did you learn whether [potential witnesses Arthur Jackson and Antonio White]

---

[3] As noted above, the prosecutor also argued *the defense* had presented no alibi witnesses. On appeal, Davis appears to concede this portion of the argument was permissible. In his reply brief, Davis characterizes the Attorney General's discussion of this point as a "straw man argument."

were with [Grier's friend] Brandon Amos and Ronnie Grier on November 13th?" Defense counsel objected the question lacked foundation and called for hearsay. The prosecutor responded: "Only to the effect on his investigation." The court stated: "It's not hearsay, so overruled. Go ahead." The prosecutor's statement does not show he assured the court all testimony about Basa's witness interviews would be used for a limited purpose. Even as to the specific exchange at issue, the record does not show the court ruled the evidence would be admitted for a limited purpose. Instead, the court stated it was overruling the objection because the question did not call for hearsay. The question (i.e., if Basa learned whether the witnesses were with Grier) permitted a "yes" or "no" answer, and did not call for Basa to recount the witnesses' statements. Basa answered, "Yes, sir." (The prosecutor then asked, "What did you learn?" Defense counsel did not object, and Basa stated he learned Jackson and White were with Amos and Grier earlier in the day on November 13.)

Similarly, the prosecutor later asked Basa if, at the time he first interviewed Taylor, Basa knew whether Grier had last been seen in Taylor's car (again permitting a "yes" or "no" answer). Defense counsel objected and asked if the response would be offered for its truth "as opposed to investigative conduct?" The court stated: "No. He was asked if he had this information. That's all. Overruled." Basa answered, "Yes, sir." (When the prosecutor then asked what the information was, defense counsel did not object, and Basa stated he had received information from different sources that Grier had been seen in Taylor's car.)

The above testimony does not support Davis's suggestion the court made a general ruling (or the prosecutor made a general assurance) that testimony about witness interviews would be admitted for a limited purpose. Instead, the court made specific rulings based on the wording of individual questions and the precise objections made by counsel.

Because the court admitted Basa's testimony that he did not locate an alibi witness, and the record does not show the court admitted the testimony for a limited

18

purpose, the prosecutor did not commit misconduct by referring to it in closing argument. (*People v. Gurule, supra,* 28 Cal.4th at p. 627.)

### b.  Admissibility of Evidence

In addition to alleging prosecutorial misconduct, Davis presents a short argument in his opening appellate brief that the court erred in admitting Basa's underlying testimony.  Davis asserts testimony about witness interviews was hearsay (if offered for the truth of witnesses' statements) or irrelevant (if offered for a more limited purpose). But, as to the testimony Davis contends the prosecutor should not have relied on (i.e., Basa's testimony he did not find an alibi witness), defense counsel did not object on grounds of hearsay or relevance.  Davis has forfeited this argument.  (*People v. Dykes, supra,* 46 Cal.4th at p. 756.)

Davis argues that, because the court overruled hearsay objections to previous questions about witness interviews, a hearsay objection to Basa's testimony about the lack of alibi witnesses would have been futile.  But the record does not support Davis's suggestion the court would have overruled any objection.  The court sustained a number of objections to questions about the investigation, on hearsay and other grounds.

### c.  Ineffective Assistance of Counsel

Davis argues that, if defense counsel's failure to make an appropriate objection to the prosecutor's argument forfeited the claim of misconduct, then counsel provided ineffective assistance.  We have determined the prosecutor did not commit misconduct, so any failure to object to the prosecutor's argument did not constitute deficient performance.

## D.  Ineffective Assistance:  The Video Recording of Fisher's Police Interview

Davis contends his trial counsel was prejudicially ineffective because she failed to make an on-the-record request to admit the video recording or transcript of the entirety of Fisher's December 15, 2008 police interview.[4]  We disagree.

---

[4] We granted Davis's motion to augment the appellate record to include a copy of the interview transcript.

### 1. Background

The record does not reflect Davis's trial counsel sought to introduce the video recording or transcript of the interview. But, in her statement of appellate issues, trial counsel stated the court's denial of Davis's "motion to permit the jury to view multiple videotaped statements of Terrell Fisher and Jamerl Taylor was a significant restriction of cross-examination." The trial record includes discussions between the court and counsel about a previous ruling, apparently made off the record, that Davis's counsel could not play for the jury videotapes of Taylor's pretrial interviews. The on-the-record discussion suggests counsel sought to introduce the videotapes to impeach Taylor's credibility. In these on-the-record discussions, the court and counsel do not refer to Fisher's interviews.

### 2. Analysis

Davis argues that, because the prosecutor questioned Basa about portions of Fisher's interview, the tape of the entire interview was admissible under Evidence Code section 356. That statute provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.) "The purpose of Evidence Code section 356 is to avoid creating a misleading impression." (*People v. Samuels* (2005) 36 Cal.4th 96, 130.)

Here, the jury saw no part of the interview tape, and received no part of the transcript. The prosecutor and defense counsel did elicit from Basa some testimony about the interview. On direct examination, Basa testified that, during the interview, Fisher stated Davis shot Grier three times in the back of the head, and said Taylor was a willing participant in the crime.

On cross-examination, defense counsel elicited that, during the first part of the interview, Fisher continued to claim he did not know what had happened to Grier. A few hours into the interview, Basa confronted Fisher, stating that, in light of other information

Basa had gathered, he knew Fisher's account was not true. Fisher then told Basa he was in the car when Grier was shot.

On redirect, Basa testified witnesses in homicide investigations are often reluctant to speak to police, and frequently do not provide information until after being interviewed multiple times. The prosecutor referred to a few portions of the interview transcript (apparently to refresh Basa's recollection), and elicited that Fisher was an unusual witness in that he voluntarily (at Basa's request) came to the police station to be interviewed and arrived an hour early. But the prosecutor also elicited that Fisher did not acknowledge until well into the interview that he was present when Grier was killed. Fisher appeared nervous and scared during the interview, and he paused and stuttered as he told Basa about Grier's death. Fisher also told Basa he could not sleep because of what he knew about the crime.

In closing argument, the prosecutor noted Fisher arrived early for the interview. The prosecutor stated Fisher initially lied to protect Davis because "[b]lood is thicker than water," but Fisher was "haunted" by what he had seen, and he finally told the truth. The prosecutor acknowledged that, even during the first portion of the interview, Fisher continued to deny knowing what happened to Grier.

Davis argues Basa's testimony on redirect examination improperly enhanced Fisher's credibility by giving the misleading impression that Fisher "agreed to questioning by the police voluntarily . . . even though it meant identifying his brother as the shooter." Davis contends admission of the entire tape was necessary (and the failure to introduce it was prejudicial) because the tape shows Basa and his partner used suggestive interrogation techniques, and Fisher was willing to provide answers he believed the investigators wanted to hear.

Even assuming trial counsel was deficient for failing to seek admission of the tape, Davis has not shown prejudice. It is not reasonably probable that, absent counsel's alleged error, Davis would have obtained a more favorable verdict. (See *Strickland, supra,* 466 U.S. at pp. 687–688, 694; *Carter, supra,* 30 Cal.4th at p. 1211.)

21

The trial testimony made clear that Fisher did not admit, until well into the interview, that he was present when Grier was killed. Basa so testified, and the prosecutor noted this fact in closing argument. The jury also knew that, during the interview, Basa pushed Fisher to change his story, admit he was present when Grier was killed, and tell the officers what he knew. Basa testified that a few hours into the interview, he confronted Fisher, and stated that in light of other information the police had obtained, he knew Fisher's account was not true. Only then did Fisher tell Basa he was in the car when Grier was shot. Defense counsel also questioned Basa about whether he used suggestive or deceptive investigative techniques, such as telling witnesses he had phone records he had not yet obtained. In closing argument, the prosecutor noted Fisher and Taylor "got squeezed by Sergeant Basa," and "[t]he Oakland police kept pressing," because Fisher's and Taylor's initial accounts were inconsistent with the information the police had obtained. The jury was not left with any misimpression that Fisher, without any encouragement or pressure from the police, changed his mind and decided to admit being present when Grier was shot.

Moreover, the transcript of the interview does not support Davis's suggestion that Fisher was willing to change his account to conform to whatever the police wanted to hear. The transcript reveals Fisher continued to deny knowledge of certain matters, even when pressed by the officers to provide more information. After Fisher told the officers that Davis shot Grier, Basa suggested Fisher must have known of Davis's and Taylor's intentions before the shooting, or must have heard them say something about planning to shoot Grier. Basa stated it was difficult to believe Fisher had no advance knowledge, because it was unlikely someone planning a shooting would let someone with no knowledge or involvement witness it. Fisher, nevertheless, continued to deny knowing anything about a plan to shoot Grier. Fisher also repeatedly denied discussing the shooting with Davis afterwards, and stated he did not know why Davis shot Grier, despite Basa's suggestion Fisher must have later asked Davis why he shot Grier.

Fisher also provided information the officers did not appear to be seeking. As noted, Fisher implicated Taylor as a willing participant in the shooting. Fisher stated he

believed Taylor knew in advance Davis was going to shoot Grier. Taylor pushed Grier's body out of the car. Taylor told Fisher weeks later that Grier " 'had to go.' " Davis does not argue on appeal (and the interview transcript does not show) that before Fisher implicated Taylor, the police encouraged him to do so. Contrary to Davis's suggestion on appeal, if jurors had watched the videotape of the entire interview, it is not likely they would have concluded the account Fisher gave was just an effort to tell the police what they wanted to hear.

For the foregoing reasons, we conclude it is not reasonably probable that, if counsel had successfully sought admission of the entire interview tape, Davis would have obtained a more favorable verdict. (See *Strickland, supra,* 466 U.S. at pp. 687–688, 694; *Carter, supra,* 30 Cal.4th at p. 1211.)

**E. Cumulative Impact of Alleged Errors**

Davis contends the cumulative impact of the errors alleged above requires reversal. (See *People v. Hill, supra,* 17 Cal.4th at p. 844.) We have concluded (in parts II.A and II.C) that the court did not commit instructional error and the prosecutor did not commit misconduct. Moreover, as we have discussed (in parts II.B and II.D), it is unlikely any error in admitting the challenged portions of Basa's testimony, or in failing to introduce the interview tape, had a significant prejudicial impact. We conclude these alleged errors, when considered cumulatively, do not rise to the level of reversible and prejudicial error. (See *ibid.*)

## III.  DISPOSITION

The judgment is affirmed.


_____
Becton, J.*


We concur:


_____
Dondero, Acting P.J.

_____
Banke, J.

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24